2014R01002/VK/LMCJR

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Jose L. Linares |
| v. | : | Mag. No. 16-8085 |
| JAMIE FOX | : | **CRIMINAL COMPLAINT** |

I, Thomas G. Sommero, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

### SEE ATTACHMENT A

I further state that I am a Police Investigator with the Port Authority of New York and New Jersey, Office of Inspector General, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part of this Complaint.

_____
Thomas G. Sommero, Police Investigator
Port Authority of New York and New Jersey
Office of Inspector General

Sworn to before me,
and subscribed in my presence
on the 14 day of July, 2016
at Newark, New Jersey

_____
Signature of Judicial Officer

THE HONORABLE JOSE L. LINARES
UNITED STATES DISTRICT JUDGE

## ATTACHMENT A

(CONSPIRACY TO COMMIT BRIBERY)

From in or about February 2011 to in or about January 2014, in the District of New Jersey, and elsewhere, defendant

JAMIE FOX

knowingly and intentionally conspired and agreed with others, including David Samson, to corruptly solicit, demand, accept, and agree to accept a thing of value, namely a non-stop United Airlines route between Newark Liberty International Airport in New Jersey and Columbia Metropolitan Airport in South Carolina, intending that Samson be influenced and rewarded in connection with the business, a transaction and a series of transactions of the Port Authority of New York and New Jersey involving a thing of value of at least $5,000, contrary to Title 18, United States Code, Section 666(a)(1)(B), and did an act to effect the object of the conspiracy.

In violation of Title 18, United States Code, Section 371.

## ATTACHMENT B

I, Thomas G. Sommero, am a Police Investigator with the Port Authority of New York and New Jersey, Office of Inspector General. I am fully familiar with the following facts based on my own investigation, my conversations with other individuals, including other law enforcement officers who have participated in the investigation, and my review of reports, documents, and other items of evidence. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause. All conversations and statements described in this affidavit are related in substance and in part, unless otherwise indicated.

During the time period relevant to the Complaint:

### THE DEFENDANT

1.  Defendant JAMIE FOX ("defendant FOX") was a principal of a New Jersey based consulting and lobbying company (the "Consulting Company"). The Consulting Company was retained by United Continental Holdings, Inc. ("United") as a consultant and lobbyist with respect to various public entities, including the Port Authority of New York and New Jersey (the "Port Authority"). For its services, United paid the Consulting Company approximately $7,500 per month. Defendant FOX was United's primary contact at the Consulting Company.

### COCONSPIRATOR DAVID SAMSON AND RELATED ENTITY

2.  David Samson was the Chairman of the Board of Commissioners ("the PA Board") of the Port Authority, an organization that operated transportation and other facilities in New York and New Jersey, including Newark Liberty International Airport ("Newark Airport" or "EWR"). As Chairman, Samson, together with the other Port Authority Commissioners, was responsible for approving the Port Authority's budgets, capital plans, and certain transactions and expenditures. In his official capacity at the Port Authority and pursuant to its bylaws, Samson exercised power over the agenda for meetings of the PA Board including, but not limited to, controlling whether an item would be placed on or removed from an agenda. Samson was an agent of the Port Authority, within the meaning of Title 18, United States Code, Section 666(d)(l).

3.  The PA Board met formally approximately ten times per year, generally with one meeting in a given month. Typically, meetings of the PA Board were preceded by meetings of the PA Board's various committees, including the Operations Committee, which oversaw the operation and maintenance of facilities and properties owned and operated by the Port Authority and the sale of property owned by the Port Authority. Samson was the Chairman of the Operations Committee.

4.  Prior to the meetings of the PA Board, the Office of the Secretary of the Port Authority (the "PA Secretary's Office") prepared an agenda based on submissions from the various departments of the Port Authority, such as the Aviation Department. The proposed

3

agenda for meetings of the PA Board (and its committees) were provided to Samson and others in advance of the meetings for their review. As Chairman of both the PA Board and its Operations Committee, Samson had the final authority on what items were included on the agenda of both meetings.

5. The Port Authority received benefits in excess of $10,000 in each of the calendar years 2011, 2012, and 2013 under Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance or other forms of Federal assistance, within the meaning of Title 18, United States Code, Sections 666(b) and 666(d)(5).

6. Samson had a house in Aiken, South Carolina. In or about 2009, on multiple occasions, Samson traveled between Newark Airport and Columbia Metropolitan Airport ("Columbia Airport" or "CAE"), located in West Columbia, South Carolina, using a non-stop route that was operated by Continental Airlines, Inc. ("Continental"). After Continental eliminated that Newark/Columbia route in or about 2009 for business reasons, Samson frequently traveled to South Carolina via a flight between Newark Airport and Charlotte Douglas International Airport in Charlotte, North Carolina ("Charlotte Airport"), followed by a drive from Charlotte Airport to Aiken. The distance between Aiken and Charlotte Airport was much greater than the distance between Aiken and Columbia Airport.

7. Samson was a personal friend of defendant FOX.

## OTHER INDIVIDUALS AND ENTITIES

8. United was an entity headquartered in Chicago, Illinois that was the parent company of United Airlines, Inc., which operated after a 2010 merger with Continental. Newark Airport was one of United's largest hubs, and United flew the majority of passengers on Newark Airport's arriving and departing flights. United leased significant portions of Newark Airport property for United's facilities, including maintenance hangars for United's airplanes.

9. United Employee 1 was a senior executive at United based at its headquarters in Chicago with authority to approve or disapprove the addition or cancellation of routes in United's network.

10. United Employee 2 was an executive at United based at its headquarters in Chicago who was primarily responsible for United's interactions with public entities, including the Port Authority, and who reported directly to United Employee 1. United Employee 2's responsibilities included interacting with defendant FOX.

11. United Employee 3 was an employee of United based in Newark, New Jersey who dealt with public entities on behalf of United, including the Port Authority, and who worked under United Employee 2. United Employee 3's responsibilities included interacting with defendant FOX.

12. United Employee 4 was an employee of United based in Washington, DC who interacted with public entities on behalf of United, and who reported to United Employee 2.

4

### THE PROPOSED AGREEMENT BETWEEN UNITED AND THE PORT AUTHORITY FOR A WIDE-BODY MAINTENANCE HANGAR AT NEWARK AIRPORT

13. In 2011, representatives of United and the Port Authority's Aviation Department (which managed Newark Airport) negotiated a proposed agreement that the Port Authority would lease approximately three acres of land at Newark Airport to United for the construction and operation of a wide-body aircraft maintenance hangar (the "Hangar"). The Hangar would enable United to perform maintenance on its incoming fleet of wide-body aircraft at Newark Airport, rather than having to perform such maintenance at a suitable United facility at another airport.

14. The proposed agreement between United and the Port Authority regarding the Hangar (the "Hangar Agreement") included the following provisions: (1) United would pay rent to the Port Authority for the use of the land on which the Hangar was to be constructed for a term of 25 years and an aggregate rental amount of approximately $20.8 million; (2) United would invest at least $25 million for the design and construction of the Hangar; (3) at the end of the 25-year lease for the land, ownership of the Hangar would revert to the Port Authority; and (4) United would relocate a taxiway at Newark Airport that would be affected by construction of the Hangar and the Port Authority would reimburse United up to $10 million for the costs of doing so.

15. Because the Hangar Agreement required the approval of the PA Board, in or about October 2011, the Port Authority's Aviation Department submitted the necessary documentation to the PA Secretary's Office so that the Hangar Agreement could be presented for consideration at the PA Board's November 15, 2011 meeting.

### OVERVIEW OF THE CONSPIRACY

16. Between in or about September 2011 and in or about December 2011, defendant FOX, together with Samson, threatened to use and did use Samson's official position and authority as the Chairman of the PA Board, including his authority to control the agenda of the PA Board and the Operations Committee, to pressure United to reinstate and operate a non-stop route between Newark Airport and Columbia Airport (the "Newark/Columbia Route" or "EWRCAE") for Samson's personal benefit.

17. To that end, Samson caused an item relating to the Hangar Agreement to be removed from the agenda of the November 15, 2011 meeting of the PA Board. Defendant FOX, together with Samson, then used the removal of the agenda item related to the Hangar Agreement to pressure United to reinstate the Newark/Columbia Route. In December 2011, in connection with another meeting of the PA Board, defendant FOX, together with Samson, continued to use the Hangar Agreement to pressure United to reinstate the Newark/Columbia Route. Defendant FOX, together with Samson, engaged in this conduct so that Samson could use this route to travel more conveniently to and from his house in Aiken.

18. As a result of Defendant FOX's and Samson's improper use of Samson's official authority, United reinstated the Newark/Columbia Route and began operating that route in or about September 2012.

19. Between October 2012 and January 2014, Samson used the Newark/Columbia Route approximately 27 times.

20. United lost money by operating the Newark/Columbia Route.

### DETAILS OF THE CONSPIRACY

21. In or about February 2011, shortly after Samson became the Chairman of the Port Authority, defendant FOX communicated to United that Samson had a house in South Carolina and wanted United to reinstate the Newark/Columbia Route. Specifically, on or about February 18, 2011 at approximately 1:03 p.m., following an approximately five-minute telephone conversation with Samson that morning, defendant FOX initiated the following email exchange with United Employee 2:

| SOURCE | TEXT |
|---|---|
| FOX | "Fyi. Samson has home in columnbia [sic], sc and has asked me repeatedly about flight from newark." |
| UNITED EMPLOYEE 2 | "Never worked financially, but will make sure that is still the case." |

22. On or about September 13, 2011, defendant FOX, Samson, and an employee of the Port Authority met with representatives of United, including United Employees 1, 2, 3, and 4, for dinner at a restaurant in New York City.

23. During this September 13, 2011 meeting, after discussion of certain of United's priorities for Newark Airport, Samson stated that Continental used to have a non-stop route between Newark Airport and Columbia Airport and asked United Employee 1 to consider reinstating that non-stop route. United Employee 1 responded that United generally stopped flying routes because they were not profitable, but told Samson that United would look into the Newark/Columbia Route.

24. After the dinner meeting, when United Employee 2 was present at the Port Authority's offices in New York City, United Employee 2 was told that the Newark/Columbia Route was important to Samson and was encouraged to look into it.

25. On September 14, 2011, defendant FOX and Samson exchanged the following emails related to the September 13, 2011 dinner meeting with the United representatives and the Newark/Columbia Route:

| SOURCE | TEXT |
|---|---|
| FOX | "I have been in the car all day. Thank you very much for last night. They were very impressed very happy." |
| SAMSON | "I only want you to be happy--and me too, of course, about the Columbia, SC flight." |

6

| Source | Text |
|---|---|
| FOX | "Am on it." |

26. Following the September 13, 2011 dinner meeting and Samson's request relating to the Newark/Columbia Route, on September 20, 2011 at approximately 9:07 a.m., defendant FOX sent an email to United Employee 3 about the Newark/Columbia Route:

| Source | Text |
|---|---|
| FOX | "Need to come up with some spin on the South Carolina flight Samson asked about. Having dinner with him next week and he asked in jest----I think—that he hoped that I had good news on the flight." |

27. In response to these requests, United personnel assessed whether the Newark/Columbia Route would be sufficiently profitable to justify its reinstatement. Specifically, on September 20, 2011, a member of United's Network Planning Group ("United Employee 5")—the group within United that assessed whether United should add or eliminate a particular route—sent emails to United Employee 3 explaining that the earlier Newark/Columbia Route flown by Continental had not been profitable and that "EWRCAE was continually one of [Newark Airport's] poorest performing markets which is why it was selected [for cancellation]" in 2009.

28. After receiving this information from United Employee 5, on September 21, 2011, United Employee 3 forwarded the email chain with United Employee 5 to United Employees 2 and 4:

| Source | Text |
|---|---|
| UNITED EMPLOYEE 3 | "This is response [sic] to Samson's question about EWRCAE (Columbia, SC) flight. I will convey to Jamie, who will directly handle follow up on this." |

29. On September 28, 2011, defendant FOX and Samson exchanged emails relating to the Newark/Columbia Route, during which defendant FOX updated Samson on his interactions with United personnel:

| Source | Text |
|---|---|
| FOX | ". . . Forgot to tell you that [United Employee 1] went back to Chicago and told [another senior-level United employee] to take a second look at Columbia. You have them dancing" |
| SAMSON | "good. I hope they dance to my tune---let me know if there's a way to keep the pressure on this issue: it will save me a lot of heartache." |
| FOX | "Am on it" |

7

30. On October 13, 2011, defendant FOX sent United Employee 2 an email that stated in the subject and body of the email:

| SOURCE | TEXT |
|---|---|
| FOX | "Samson called me again on the columbia, sc flight"<br>"Just need direction so I can come up with a plan to figure out how to either let him down gently or buy time" |

In response, United Employee 2 sent an email to defendant FOX, copying United Employee 4:

| SOURCE | TEXT |
|---|---|
| UNITED EMPLOYEE 2 | "[United Employee 4] was following up. Copying him." |

31. On October 18, 2011, beginning at approximately 11:53 a.m., defendant FOX and Samson exchanged the following emails:

| SOURCE | TEXT |
|---|---|
| SAMSON | "... Any news from Continental about Columbia, SC-Newark?" |
| FOX | "I asked again last week and they were meeting yesterday about it. will check in now" |
| SAMSON | "Good, will be going there for Thanksgiving." |

Defendant FOX's email to Samson was sent at approximately 11:56 a.m. on October 18, 2011. One minute later, at approximately 11:57 a.m., defendant FOX telephoned United Employee 3. Two minutes after placing that call, at approximately 11:59 a.m., defendant FOX sent an email to an employee of the Consulting Company (the "Consulting Employee") commenting on United's apparent failure to respond to the attempts to have United reinstate the Newark/Columbia Route:

| SOURCE | TEXT |
|---|---|
| FOX | "[United Employee 3]should [sic] worry less about nonsense and get a damn answer on the Samson flight which [United Employee 3] has been ignoring me on. Drives me crazy. I have a call into [United Employee 3]" |

32. Approximately three minutes after sending this email, at approximately 12:02 p.m. on October 18, 2011, defendant FOX received a telephone call from United Employee 3 that lasted approximately two minutes. After that telephone call ended, at approximately 12:08 p.m., defendant FOX and the Consulting Employee exchanged the following emails:

8

| SOURCE | TEXT |
| --- | --- |
| FOX | "They turned Samson flight down. That is stupid" |
| CONSULTING EMPLOYEE | "Who? What happened?" |
| FOX | "Samson wanted a continental flight resumed to south Carolina. He asked them personally at the dinner with [United Employee 1]----after they asked for everything they wanted. They just told me to say no. ugh" |

33. Later on October 18, 2011, at approximately 12:25 p.m., defendant FOX sent an email to Samson conveying United's response to Samson's request to reinstate the Newark/Columbia Route:

| SOURCE | TEXT |
| --- | --- |
| FOX | "Have a call into you. just got off phone with [United Employee 3] and it is not looking good. I am going up the ladder" |

34. After United communicated to defendant FOX in or about October 2011 that it likely would not reinstate the Newark/Columbia Route, defendant FOX and Samson used Samson's official position and authority as the Chairman of the Port Authority to convey to United that its interests involving the Port Authority could be harmed if United did not reinstate the Newark/Columbia Route.

35. In or about October 2011, the Port Authority's Aviation Department submitted the Hangar Agreement to the PA Secretary's Office so that it could be presented for consideration at the PA Board's November 15, 2011 meeting. The Hangar Agreement was included on a proposed agenda for the PA Board's November 15, 2011 meeting, which Samson reviewed with a member of the PA Secretary's Office on or about November 1, 2011.

36. The next day, on November 2, 2011, defendant FOX and Samson discussed by email the Newark/Columbia Route and how Samson could use his official position as the Chairman of the Port Authority to pressure United to reinstate the Newark/Columbia Route:

| SOURCE | TEXT |
| --- | --- |
| SAMSON | "Forgot to ask: any news from Continental?" |
| FOX | "Have not given up. Flying to chicago to see them and it is on my list" |
| SAMSON | "In the meantime, I am reviewing current Board agenda items of interest." |
| FOX | "One on newark airport I think coming up. Maybe it needs further review!!!!!" |
| SAMSON | "Yes, it's already off this month's agenda: I hate myself." |

This exchange about "[o]ne [of the PA Board's agenda items] on newark airport" was a reference to the Hangar Agreement.

37. Subsequent to this November 2, 2011 email exchange between defendant FOX and Samson, on or about November 9, 2011, Samson caused the PA Secretary's Office to remove the Hangar Agreement from the proposed agenda for the November 15, 2011 PA Board meeting, before the agenda and other materials were transmitted to the other Port Authority Commissioners.

38. On November 14, 2011 at approximately 12:09 p.m. and 12:13 p.m., United Employee 3 exchanged telephone calls with an individual at the Port Authority. Approximately 40 minutes after these telephone calls, at approximately 12:50 p.m., Samson sent the following email to defendant FOX:

| Source | Text |
| --- | --- |
| SAMSON | "just got final decision (through [an individual]) about Columbia-Newark opportunity--very, very disappopinted [sic]--no more dinners with [United Employee 1]." |

39. On November 15, 2011, the PA Board held a meeting of all Commissioners, as well as a meeting of the Operations Committee. The Hangar Agreement was not included on the agenda for either of those meetings.

40. The day after the PA Board meeting, on November 16, 2011, defendant FOX initiated the following email exchange with United Employee 2:

| Source | Text |
| --- | --- |
| FOX | "One of these days I think I need to chat with you about the [Port Authority] and Samson" |
| UNITED EMPLOYEE 2 | "Remind me" |
| FOX | "Just general discussion. [Port Authority] is under attack in press for the bureaucracy top leadership giving themselves additional pay which board knew nothing about. This could have ramifications for us I am also worried about samson view of company" |
| UNITED EMPLOYEE 2 | "What affected his view of us? Do we need to quickly address?" |

41. Following this exchange of emails, on November 16, 2011 at approximately 12:49 p.m., United Employee 2 telephoned defendant FOX. During that telephone conversation, defendant FOX conveyed to United Employee 2 that Samson was angry because United had not agreed to reinstate the Newark/Columbia Route. Defendant FOX also told United Employee 2 that United's decision not to reinstate the Newark/Columbia Route was having a negative impact on United's relationship with the Port Authority. In response, United Employee 2 agreed to revisit the decision.

42. After the telephone call between defendant FOX and United Employee 2, on November 16, 2011 at approximately 4:09 p.m., defendant FOX sent the following email relating to the Newark/Columbia Route to Samson:

| SOURCE | TEXT |
|---|---|
| FOX | "I have spoken to the continental folks in Chicago on a number of issues. our number one issue is is [sic] still in play and I am seeing them on the 2nd and 3rd. don't shoot until you see the whites of their eyes. . . ." |

On December 2, 2011, defendant FOX and Samson exchanged emails in which defendant FOX promised Samson that he would raise the issue face to face:

| SOURCE | TEXT |
|---|---|
| FOX | "Off to chicago to see continental folks. Giving our issue one more push." |
| SAMSON | "Good luck, please." |

43. Subsequently, defendant FOX and Samson met for dinner at a restaurant in New York City on December 6, 2011. In and around the time of the dinner, defendant FOX and United Employee 2 had a telephone conversation. During that telephone conversation, defendant FOX conveyed to United Employee 2 that defendant FOX was calling from the restroom of a restaurant at which he was meeting with Samson. Defendant FOX conveyed to United Employee 2 that Samson was angry with United's lack of action on the Newark/Columbia Route. Defendant FOX also stated that reinstating the Newark/Columbia Route was important for the airline's relationship with the Port Authority. United Employee 2 agreed to become involved personally in evaluating the reinstatement of the Newark/Columbia Route.

44. The next day, on December 7, 2011, Samson initiated the following email exchange with defendant FOX with the subject line "Continental":

| SOURCE | TEXT |
|---|---|
| SAMSON | "told [an individual] to remove agenda item--let me know if/when remedial action is appropriate." |
| FOX | "I think it would be a good time to put back on the agenda." |
| SAMSON | "will do." |

Samson's statement about an "agenda item" was a reference to the Hangar Agreement.

45. On the morning of December 8, 2011, the PA Board held a meeting of the Operations Committee that was chaired by Samson and which preceded a meeting of the full PA Board to be held later that day. As defendant FOX had recommended, Samson included the

11

Hangar Agreement on the Operation Committee's agenda and the PA Board's agenda. The Hangar Agreement was presented at the meeting of the Operations Committee, which voted unanimously to advance it to the full PA Board where it also passed unanimously.

46. After communicating with United Employee 3 about the Operations Committee meeting, at approximately 2:26 p.m. on December 8, 2011, United Employee 2 had a telephone conversation with defendant FOX and asked him what was happening with respect to the PA Board's consideration of the Hangar Agreement. Defendant FOX conveyed to United Employee 2 that Samson had been responsible for removing the Hangar Agreement from the PA Board's agenda for the November 15, 2011 meeting because United had not agreed to reinstate the Newark/Columbia Route. United Employee 2, understanding that declining to do so could harm future United business with the Port Authority, told defendant FOX that United Employee 2 would try and get United to reinstate the Newark/Columbia Route. United Employee 2 understood that Samson wanted United to reinstate the Newark/Columbia Route only because it would be more convenient for travel to his house in South Carolina.

47. After the telephone conversation with United Employee 2, at approximately 3:10 p.m., defendant FOX initiated the following email exchange with Samson:

| Source | Text |
|---|---|
| FOX | "it worked. Chicago just called to discuss how to get this done" |
| SAMSON | "Passed agenda item today." |

Defendant FOX's use of "Chicago" was a reference to the location of United's headquarters, where United Employee 2 was based. Samson's statement about "agenda item" was a reference to the Hangar Agreement. Less than two hours after this email exchange, at approximately 5:16 p.m. on December 8, 2011, Samson initiated the following email exchange with defendant FOX:

| Source | Text |
|---|---|
| SAMSON | "What news from Continental?" |
| FOX | "Finally have their attention. Having item off/on this week worked . . . ." |

Defendant FOX's use of "item" was a reference to the Hangar Agreement.

48. On December 14, 2011, Samson sent an email to defendant FOX with the subject line "Any news?":

| Source | Text |
|---|---|
| SAMSON | "flying to SC for Christmas, by way of Charlotte, NC." |

12

49. The next day, on December 15, 2011, referring to the Newark/Columbia Route, defendant FOX sent the following email to Samson:

| SOURCE | TEXT |
|---|---|
| FOX | "I think we are getting this done!!!!!!" |

50. As a result of the repeated requests to United and defendant FOX's and Samson's use of Samson's official position to pressure United, United decided to reinstate the Newark/Columbia Route. Specifically, United Employee 2 met with United Employee 1 and another United employee ("United Employee 6"). United Employee 2 conveyed to both United Employee 1 and United Employee 6 that Samson wanted the Newark/Columbia Route reinstated, that it was important to Samson, and that Samson could adversely affect United's business interests if United did not reinstate the route. After being presented with this information by United Employee 2, United Employee 1 authorized the reinstatement of the Newark/Columbia Route.

51. United's decision to reinstate the Newark/Columbia Route departed from its standard process for adding a route to United's network. In addition, United had no business reason to reinstate the Newark/Columbia Route because forecasts projected that it would perform worse than existing routes and that it would likely lose money.

52. In separate conversations, United Employee 2 conveyed to both defendant FOX and another individual that United would take steps to reinstate the Newark/Columbia Route. Defendant FOX responded to United Employee 2 that he and Samson were very pleased with the decision. United Employee 2 similarly learned from another individual that Samson would be pleased with United's decision to take steps to reinstate the route.

53. United Employee 2 asked defendant FOX about Samson's preference for the schedule for the Newark/Columbia Route. On December 16, 2011 at approximately 2:10 p.m., United Employee 2 telephoned defendant FOX. After that call, defendant FOX sent Samson the following email at approximately 2:14 p.m.:

| SOURCE | TEXT |
|---|---|
| FOX | "Can you call me when you have a chance-----I need info on our subject" |

Defendant FOX later conveyed to United Employee 2 that Samson's preferred travel schedule to South Carolina was to depart from Newark Airport on Thursday evenings and to return on Monday mornings.

54. Based on Samson's preference as conveyed by defendant FOX, United decided on a weekly schedule that only included flights from Newark Airport to Columbia Airport departing at 6 p.m. on Thursdays (with a returning flight the same night) and from Columbia Airport to Newark Airport departing at 6:20 a.m. on Mondays (after a flight to Columbia Airport the evening before). United Employee 2 conveyed this schedule to defendant FOX who,

in turn, informed Samson. Specifically, on January 10, 2012, defendant FOX and Samson had the following email exchange:

| SOURCE | TEXT |
| --- | --- |
| SAMSON | "Thanks for joining me for dinner, great fun--any further word on . . . , Continental?" |
| FOX | "6pm flight on thursday, returning 620 am on monday. Begins jan 28. . . ." |
| SAMSON | "you are the best." |

55. United began flying the Newark/Columbia Route in or about September 2012 and operated the route until in or about March 2014. As United's analysis had predicted, United's operation of the Newark/Columbia Route was not profitable and lost money.

56. Samson used the Newark/Columbia Route on approximately 27 occasions between in or about October 2012 and in or about January 2014.

57. On multiple occasions, Samson and others referred to the Newark/Columbia Route as the "Chairman's Flight." For example, on or about November 29, 2012, defendant FOX and Samson exchanged the following emails:

| SOURCE | TEXT |
| --- | --- |
| FOX | "Heading south today?" |
| SAMSON | "Yes – Chairman's flight – Are you coming down for the weekend?" |

58. Defendant FOX also referred to the Newark/Columbia Route as "Samson Air."